**GIMBEL et al. v. HARRIMAN NAT. BANK & TRUST CO. OF CITY OF NEW YORK et al.**

District Court, S. D. New York.
Sept. 13, 1935.

Blandy, Mooney & Shipman, of New York City (William W. Shaw and Thomas F. Morris, both of New York City, of counsel), for plaintiffs.

Conboy, Hewitt, O'Brien & Boardman, of New York City (John Vance Hewitt and Hobart L. Brinsmade, both of New York City, of counsel), for defendants.

WILKERSON, District Judge.

Plaintiffs are the surviving trustees under the will of Louis S. Gimbel. The will authorized the trustees to name a trust company, either as custodian of the assets, or as sole trustee, or cotrustee. Acts of the trustees, to be binding, must be concurred in by a majority of them.

The trustees deposited with the Harriman Bank, as custodian for safekeeping, certain securities held by them for the trusts created by the will. The bank was never designated as a trustee. The letter of instructions given by the trustees to the bank provided that when instructed to deliver for sale any securities in the safekeeping account, the bank was to dispose of the proceeds of such sale, as well as all other collections made by it, as follows: "Principal—Deposit to credit of the undersigned, principal account." "Income—Deposit to the credit of the undersigned, income account."

The letter further provided that all communications pertaining to the account should be signed by two of the trustees, one of whom should be the beneficiary of the trust for whose benefit the account was opened. In conformity with the instructions, two checking accounts were opened in the banking department for each trust. The signature cards provided that the signatures of two trustees were necessary for the withdrawal of funds from any of those accounts.

There were many transactions by which income was collected and securities sold and the proceeds placed in the checking accounts of the trustees pursuant to the letter of instructions.

On February 20, 1933, two letters were sent by plaintiffs to the bank directing the delivery to brokers of United States Treasury bonds from each safekeeping account, and stating that the bank would receive $39,354.24 for each lot of bonds "which is to be deposited and credited to the ledger account." Pursuant to these instructions and in accordance with the uniform practice the securities withdrawn were entered under the "withdrawal" column on the security ledger cards in the trust department, and the amount of the proceeds received by check on February 21, 1933, was credited on the ledger cards. On the same day balancing entries in the same amount were made on the ledger cards of each trust. Credit slips, dated February 21, 1933, for those amounts were sent to the banking department, and the proceeds were credited in the general deposit accounts of the trustees in the banking department. The transactions were confirmed by sending to each of the plaintiffs credit slips stating that each principal account had been so credited. Those credit slips were identical in form with many others which had been previously received by the plaintiff trustees and were understood by the trustees as crediting the amounts in the banking department accounts upon which the trustees could draw checks. On March 3, 1933, the bank received a letter from Louis S. Gimbel, Jr., instructing that the moneys received

covering the proceeds of the sale of the bonds for the account of Julia M. Gimbel, custodian account, and Louis S. Gimbel, Jr., custodian account, should be credited to the respective accounts from which the bonds were taken. To this letter the trust officer of the bank, on March 3, 1933, replied, as follows:

"When these accounts were originally opened at this office, the letter of instructions authorized the opening of two accounts in the banking department; one of which, known as the income account, was to be used for all credits resulting from the collection of interest and dividends on securities deposited; the other, known as the principal account, to which were to be credited all proceeds from the sale of securities.

"In the letter authorizing us to deliver the Treasury bonds to Wertheim & Company against payment, no mention was made of the fact that proceeds of this sale were to be credited to any account other than the principal account in our banking department.

"In accordance with your previous request and pending definite instructions over the signatures of both of the Trustees, we have withdrawn the monies credited to the account in the banking department and placed them in the principal cash account in the custody department. Incidentally your letter of instructions should request that the money above referred to be credited to this account."

From February 15, 1933, until March 3, 1933, when the bank was closed, there was a severe run on the bank. Louis S. Gimbel, Jr., was in New York. His cotrustee was in Florida. The signatures of both were necessary to the withdrawal of the money from the bank. In this situation an attempt was made to create a trust relationship with the bank under which the benefits of section 248 (k) of title 12 of the United States Code (12 USCA § 248 (k) could be invoked. The acts by which it was attempted to create this trust relationship were contrary to the regular course of business between the trustees and the bank. At the request of Louis S. Gimbel, Jr., charge tickets were made by the trust officer of the bank which recited that the money had been credited to the accounts in the banking department "in error." The credits were charged off in the banking de-

partment and placed to the credit of the trustees in the safekeeping department. The credits in the banking department were not made in error. On the contrary, they were made in strict accordance with the letter of instructions to the bank signed by both trustees, and the uniform course of business with reference to the sale of securities and the disposition of the proceeds. There was no proper authority from the trustees for the attempted reversal of entries. There is no evidence in the record that the trust officer who directed the reversal of the entries had any authority to cancel a credit in the banking department or to waive the requirement of two signatures in the department.

The bank was closed on March 4, 1933, pursuant to the bank holiday proclaimed by the Governor of New York, and remained closed under subsequent proclamations by the Governor and the President. On March 13, 1933, a conservator was appointed by the Comptroller of the Currency. The bank was insolvent at the close of business on March 3, 1933.

On March 9, 1933, when under the proclamations of the Governor all banking institutions were closed and all banking transactions suspended, the trustees delivered to the bank a letter bearing date of March 4, 1933, directing the bank to transfer the funds received from the sale of the bonds from the principal account to the "principal cash account in the custody department." On March 7 and March 10, 1933, entries were made on the ledger sheets of the trust department that certain bonds had been placed in the trust department as "investments to secure trust funds."

Plaintiffs attempt to make something of the fears of the trustees as to the condition of the bank, the withdrawals by them of moneys from the accounts, the sale by them of stock in the bank, and the conversations between the trustees as to the disposition of the proceeds of sale of the bonds. Obviously these are matters which cannot affect the rights of other creditors and they cannot operate to create a preferential position not warranted by the terms of the will, the letters of instruction, and the transactions with the bank. The evidence as to conversations between the trustees should be,

and is, stricken from the record and must be disregarded.

The court concludes: The credits in the banking department made on February 21, 1933, were authorized by the trustees and the trustees on that date became creditors of the bank.

 The reversal of entries on February 27, 1933, and the subsequent correspondence between one of the trustees and the trust officer of the bank were ineffectual to make the bank a trustee under section 248 (k) of title 12 USCA.

A trust res was not created by the reversal of book entries, the original entries having been made correctly.

The assets of the bank were not augmented by any new cash on or after February 27, 1933.

The bank did not receive in trust the funds of the claimants. The trustees designated the bank a depositary for safe-keeping of securities only. The trustees had the power under the will to name the bank trustee or cotrustee, but did not exercise it in the manner prescribed in the will. The trust estates were managed and controlled by the trustees named in the will.

 The National Banking Act requires a pro rata distribution of the assets of an insolvent national bank among all of its creditors, and the burden of proof is upon the plaintiffs to show transactions amounting to a trust relationship before the closing of the bank.

The bank was insolvent when it closed on March 3, 1933.

The rights of all claimants and creditors against the bank were fixed as of the closing of the bank on March 3, 1933, and instructions given after that date and collateral set aside as security after that date cannot operate to give plaintiffs a preferential position over other creditors of the bank.

The bill should be dismissed for want of equity.

Findings of fact and conclusions of law in accordance with the equity rule may be drafted by counsel for defendants and submitted **for entry on proper** notice to plaintiff.